UNITED STATES v. PETRY CO. (No. 2089). PETRY CO. v. UNITED STATES (No. 2091).[1]

TEXTBOOKS—BILINGUAL BOOKS—BOOKS PRINTED CHIEFLY IN LANGUAGES OTHER THAN ENGLISH.

A series of books of general interest (mainly fiction), known as "Brentano's Bilingual Series," consisting of parallel translations in English and another language, are not "textbooks" within the meaning of that provision in paragraph 426, tariff act of 1913. Neither are they printed "chiefly in languages other than English," under the same paragraph. The collector's classification of them as books not specially provided for, under paragraph 329, should have been sustained by the Board of United States General Appraisers.

United States Court of Customs Appeals, February 8, 1922.

CROSS-APPEALS from Board of United States General Appraisers, G. A. 8409 (T. D 38613).

[Modified.]

Bert Hanson and *William W. Hoppin*, Assistant Attorneys General (*Martin T. Baldwin* and *John J. Mulvaney*, special attorneys, of counsel), for the United States. *Walden & Webster* contra.

[Oral argument May 4, 1921, by Mr. Baldwin and Mr. Webster.]

Before SMITH, BARBER, and MARTIN, Associate Judges.

[Oral reargument October 6, 1921, by Mr. Mulvaney and Mr. Webster.]

Before DE VRIES, Presiding Judge, and SMITH, BARBER, and MARTIN, Associate Judges.

MARTIN, Judge, delivered the opinion of the court:

The merchandise now in question consists of two cases of books which were invoiced at London, England, and were entered at the port of New York.

The importer claimed free entry for the books as textbooks, under the enumeration of "textbooks used in schools and other educational institutions," in paragraph 426 of the tariff act of 1913.

The collector, however, held that in fact the books were not textbooks. He accordingly assessed them with duty at the rate of 15 per cent ad valorem under the provision for books not specially provided for in paragraph 329 of the act.

The importer protested, claiming, as aforesaid, that the books were textbooks used in schools and other educational institutions,

[1] T. D. 39019.

and furthermore claiming that they were printed chiefly in languages other than English, and that for both reasons they were entitled to free entry under paragraph 426 aforesaid.

The following is a copy of the paragraph just cited:

(Free list.)

426. .Books and pamphlets printed wholly or chiefly in languages other than English; also books and music, in raised print, used exclusively by the blind, and all textbooks used in schools and other educational institutions; Braille tablets, cubarithms, special apparatus and objects serving to teach the blind, including printing apparatus, machines, presses, and types for the use and benefit of the blind exclusively.

The record does not clearly indicate the exact number of publications involved in the protest, but apparently there were in all 19 different works. At the trial before the board the parties selected five of these to serve as samples, and they were made exhibits in the case. Two witnesses were then examined by the importer in support of the claim that the books were textbooks. No testimony was offered in support of the claim that the books were printed "wholly or chiefly in languages other than English," the importer's counsel stating that upon that subject the exhibits would speak for themselves.

The board decided that the books were not textbooks, and denied that claim for free entry. But the board held that certain of them were printed chiefly in languages other than English, and as to these the protest was sustained. As to all others of the books the protest was overruled.

Thereupon cross-appeals were filed in this court by the respective parties, and accordingly both branches of the board's decision are now before the court.

The books in question belong to a series entitled "Brentano's Bilingual Series." Each volume contains a story or other literary material either in English or a foreign language, together with a literal translation thereof into a second language, the two being printed in parallel lines upon opposite pages of the book. By this means a reader has always before him a left-hand page printed in one language and a right-hand page of translation, the two pages containing literal translations of each other, with the corresponding lines arranged exactly parallel with one another. This arrangement continues throughout each volume, and accordingly the books are truly bilingual, for the two mutual translations are so nearly equivalents that they occupy respectively the same number of printed lines and pages, and these throughout are exactly parallel with one another. Invariably one of the languages thus employed is English; that is to say, if English be the original language of the work the corresponding translation will be French, Spanish, or other foreign tongue, whereas

if the original language of the work be foreign, the translation will be English. The translations are as nearly literal as is consistent with correct expression in the several languages.

One of the sample volumes contains a short story in English by W. W. Jacobs, translated into Italian. Another contains an English story by the same writer translated into French. Another contains a Spanish story, and still another a Russian story, both translated into English. The fifth sample volume is a conversation manual designed for the use of English-speaking travelers in France, giving in parallel lines upon opposite pages many short sentences such as tourists employ when visiting a foreign country. The volume also contains a short dictionary for the translation of selected English words into French. The two outside pages of the paper backs or coverings of the respective volumes, upon which is printed the name of the work, together with brief descriptions and advertisements thereof, as well as the publisher's imprint, are printed exclusively in English, except that several of the foreign stories are listed thereon in their original language.

We may say at once that in our opinion the books thus described are none of them "textbooks used in schools and other educational institutions," and this conclusion we think is justified by an examination of the books themselves as well as by the testimony.

In the case of Dutton v. United States (6 Ct. Cust. Appls., 460, 466; T. D. 35987), this court, in dealing with the term "textbooks" in the same tariff provision as the present, said:

We are satisfied that the term in question properly bears a more limited meaning than that, and applies only to such books as either set out in their text the facts or principles of some branch of learning which is to be taught to students or to such as are prepared with special introductions, notes, glossaries, spacings, or other "editorial apparatus," which particularly adapt them for the use of students or instructors engaged in classroom work as a class apart from mere general readers.

See also G. A. 8195 (T. D. 37781); also Wakem & McLaughlin v. United States (10 Ct. Cust. Appls., 24; T. D. 38259).

The books now in question plainly are not prepared or intended for the use of students or instructors when engaged in classroom work as a class apart from mere general readers. The book entitled "French for the Traveler" is of course merely a handbook designed for the use of English-speaking people when traveling in France. The story books, it is true, are intended to assist students of languages by furnishing comparative texts upon opposite pages as aforesaid, but they are thereby made particularly serviceable for general use outside of the classroom. They contain no notes, glossaries, or other "editorial apparatus," such as are above referred to, and are plainly and indeed even professedly designed for general use by all persons who may desire either to acquire or renew a knowledge of some

foreign language. We accordingly agree with the board in its decision against this branch of the importer's contention.

The alternative contention of the importer, as aforesaid, is that the importations are entitled to free entry under the enumeration of "books and pamphlets printed wholly or chiefly in languages other than English." Upon this point the board held as follows:

We find, however, that there is some merit in the alternative contention of these importers that certain of these books are printed chiefly in languages other than English. It is true that the same text is printed twice in each book, to wit, in English and in some other language; but we find from a close personal inspection of the exhibits that in some instances the foreign words exceed in number those in the English text, whereas in others the contrary is the case. For example, Exhibits 4 and 5, printed in Russian-English and Spanish-English, respectively, contain less foreign than English printed matter, whereas the remaining three books in evidence—those marked Exhibits 1, 2, and 3—contain more foreign than English printed matter. We therefore hold the books printed in Italian-English, represented by Exhibit 1 herein, and those printed in French-English and represented by Exhibits 2 and 3, to be properly entitled to free entry under paragraph 426 as books printed chiefly in languages other than English, as claimed by the importers. As to all other books, and in all other respects, the protest is overruled.

It will be observed that the foregoing finding of the board classifies the two English stories by Jacobs (with parallel foreign translations) and also the conversation manual, aforesaid, as books printed "wholly or chiefly in languages other than English," whereas the Russian and Spanish stories (with parallel translations) are severally excluded from that classification. According to this conclusion the stories by the English writer (with translations) and also the conversation manual would be admitted free of duty, while those by the Russian and Spanish authors (with translations) would be denied free entry.

We are not able to agree with this conclusion. We do not consider it necessary in this case to examine narrowly into the exact force and effect which should be given to the tariff provision now in question, for we think that whatever interpretation might be placed upon that provision it must be said that a volume like those above described would be equally divided between the two contrasting languages composing it and therefore could not fairly be said to be printed chiefly in either. In this view free entry must be denied the importations, since that right is limited to books which are printed not equally but wholly or chiefly in languages other than English.

We may also refer again to the English print upon the first and last pages of the coverings of the respective volumes, for we think that if these pages be taken into account the competing languages in each volume would not stand at a balance, but that the scales would incline against the foreign print in each.

The decision of the board, therefore, in so far as it overruled the protest is affirmed, and in so far as it sustained the protest is overruled. *Modified.*

## CONCURRING OPINION.

SMITH, Judge: The free list provision for "books and pamphlets printed exclusively in languages other than English" appeared for the first time in paragraph 513 of the tariff act of 1890. That provision, reenacted by paragraph 411 of the act of 1894 and by paragraph 502 of the act of 1897, was held to exclude from free entry all books not printed *wholly* in a foreign language. Indeed, the provision was so interpreted that it was held inapplicable to a book having any English whatever within its covers. (T. D. 12578; T. D. 12584; T. D. 24424; E. P. Dutton & Co. *v.* United States (154 Fed., 214), reversing T. D. 25803; T. D. 28026.)

During the preparation of the tariff bill of 1909 certain publishing houses, the typothetae of New York, and the bookbinders' association of the same city joined hands to have all books excluded from the free list of the new bill.

On the hearings before the Ways and Means Committee, libraries and educational institutions vigorously opposed the change and claimed that the demand for books in a foreign language was too small to warrant their publication by American publishers. This contention was not disputed and at least one of the publishing houses advocating a duty on all books admitted that—

many of the books printed in a foreign language in a foreign country are of such a nature that their production does not collide with any prerogatives of American labor, inasmuch as the demand in this country for such books would be too small for any American publisher to feel encouraged in the undertaking of their publication, but it is also a fact that American publishers whose peculiarity of business or trade gives them more or less work in foreign languages designed for home consumption will, under the prevailing conditions, find it decidedly to their individual advantage to farm out such work in Europe, thus taking away from American labor what legitimately belongs here. (Tariff hearings, 1908, 1909, Vol. VI, p. 6288.)

The House was apparently not convinced that all books should be subjected to duty, and as the advocates of free books asked no change in the wording of any of the free-list provisions then in effect, they were drafted into the House bill and went to the Senate just as they stood in the act of 1897. The House provision for "books and pamphlets printed exclusively in languages other than English" was favorably reported by the Finance Committee of the Senate without amendment or alteration. In Committee of the Whole, however, Senator du Pont called attention to the word "exclusively" in the provision, whereupon the following colloquy took place:

Mr. DUPONT. I ask the Senator in charge of the bill about the word "exclusively" in paragraph 508. Do I understand that a work in German, containing a few words in English that might make it more definite, would come within this paragraph? I can conceive a ruling that would nullify this whole provision.

Mr. ALDRICH. No; the courts have held that that did not make it dutiable.

Mr. DUPONT. I ask that paragraph 508 may be passed over, because I intend at the proper time to move an amendment striking out the word "exclusively." (Congressional Record, par. 2, 61st Cong., 1st sess., pp. 1517, 1518.)

Subsequently the Finance Committee of the Senate reported an amendment striking out the word "exclusively" and inserting in lieu thereof the word "chiefly." That amendment was agreed to by the Senate, concurred in by the House, and the provision for "books and pamphlets printed *chiefly* in languages other than English" became paragraph 518 of the act of 1909. Four years later that paragraph, word for word, became part of the tariff bill of 1913 as it passed the House. The Finance Committee of the Senate, however, struck out of the paragraph the language exempting from duty the foreign-language books therein provided for and limited the exemption to books and music for the blind. The Committee of the Whole declined to accept the Finance Committee's amendment, and as finally reported to the Senate the House provision was amended so as to read "books and pamphlets printed *wholly* or chiefly in languages other than English." In that form the provision passed the Senate, and the House concurring it became a part of paragraph 434 of the tariff act of 1913.

From this history of the legislation it is apparent that Congress definitely reached the conclusion that certain foreign-language books should be admitted free of duty and that the requirement that they should be exclusively in a language other than English was an unwise limitation.

What they meant by "chiefly in languages other than English" is not so clear. The board construed the provision to mean books and pamphlets which contained more foreign words than words in English. While that interpretation of the provision conforms to that given to the word "chiefly" in many other parts of the tariff act, it effectuates anomalies and probably a discrimination in duties manifestly not intended by Congress, and therefore it ought not to be accepted if the language used is fairly open to a construction productive of more reasonable results and less likely to favor some foreign-language books to the disadvantage of others of the same kind.

In this very case Jacobs's Selected Stories translated from English into French and Italian were held by the board to be free of duty, whereas stories translated from original Russian and Spanish into English were denied the favor of the free list. Apparently the ideas expressed in English in Jacobs's Stories required for their expression in French and Italian a greater number of words, whereas the ideas expressed in Spanish and Russian demanded for their translation a greater number of English words. It might well occur, therefore, that an English work translated into French and Italian would under the board's construction be admitted free of duty, whereas the very

same work translated into Russian or Spanish would be subjected to duty. More than that, if the number of words or the preponderance of text determines classification, it would be quite possible to have a foreign work accompanied by its English translation admitted free of duty when translated by one translator and denied free entry when translated by another whose style was less concise. If the board's interpretation be rejected for the reasons stated, and I think it must be, then we are forced to the conclusion that the phrase "books * * * chiefly in a language other than English" means books whose chief worth or value to the reader is the foreign-language component thereof; that is to say, books of which the foreign language is the main, principal, and important part, and to which books the English language used is incidental, or subsidiary or merely explanatory of words or portions of the foreign text.

Some of the books in question are made up of an original foreign text and a complete English translation thereof and others are composed of an original English text accompanied by a full translation into a foreign language. It can hardly be said that the English found in such books is either incidental or subsidiary to the foreign language or merely explanatory of foreign words or parts of the foreign text. Such English was designed to be and is, in fact, of just as much importance as is the foreign language of which it is the translation or into which it is translated. I am therefore of the opinion that none of the books in issue were entitled to free entry, and that the decision of the board in so far as it overrules the protests should be affirmed and in so far as it sustains them it should be *reversed*.